UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Vigilante.com, Inc.,

        Plaintiff,

    v.

Argus Test.com, Inc., et al.,

        Defendant(s)

No. CV04-413-MO

OPINION AND ORDER

**MOSMAN, J.,**

    Plaintiff VIGILANTe.com, Inc. ("Vigilante") sells software that diagnoses and corrects security vulnerabilities within computer networks. Vigilante's complaint asserts twenty claims for relief against twelve defendants, whom Vigilante alleges conspired to steal its products, services, and customer relationships. Before the court are several motions to dismiss and motions for judgment on the pleadings filed by various groups of defendants, as well as Vigilante's motion to dismiss a counterclaim against it. As set forth below, defendants' motions to dismiss and motions for judgment on the pleadings (#44, 55, 57, 60, and 62) are granted in part and denied in part. Vigilante's motion to dismiss (#72) is granted.

## I.    Standard of Review

    Federal Rule of Civil Procedure 12(h)(2) allows a motion for failure to state a claim to be raised in a motion for judgment on the pleadings after an answer has been filed. *Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir. 1980). In this circumstance, "the motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6)." *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988). "Not only must the court accept all material

allegations as true, but the complaint must be construed, and all doubts resolved, in the light most favorable to the plaintiff." *Id.*

"[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 48 (1957). Rather, a compliant need only provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* Accordingly, "[a] motion to dismiss for failure to state a claim may not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) (internal quotation omitted). "Nonetheless, conclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim." *McGlinchy*, 845 at 810.

## II.     Plaintiff's allegations

Vigilante sells software and offers services related to diagnosing and correcting security vulnerabilities within computer networks. Vigilante owns the rights to software bearing the names "SecureScan v. 3.0" and "AppShaker" and a service named "SecureTest," and internally employs a database of customer information dubbed "Vigi WDI." Vigilante's French subsidiary, VIGILANTe S. A. ("VSA"), owns the rights to the "SecureScan Perimeter" service and the "SecureScan NX" and "SecureScan SP" software. The complaint alleges Vigilante "served as the U.S. marketing, distribution and customer support arm of the organization."[1]

_____

[1] It is not clear what Vigilante means by this characterization. As the corporate parent, Vigilante is a separate entity from VSA, and this vague allegation does not explain the arrangement by which Vigilante provided marketing, distribution or customer support services for VSA.

In November 2002, Sprint placed a $300,000 order for an annually-renewable license for VSA's SecureScan SP software. Sprint also indicated that if it were satisfied with the product, it would purchase a second $300,000 annual license to cover a larger portion of its network. In July 2003, Sprint announced it was very satisfied with the SecureScan SP product and that it had "every intent to go forward with purchasing the remainder of the enterprise license." However, Sprint had not yet obtained final administrative approval for the funds to purchase the second license. Vigilante entrusted defendant Eric Fullerton ("Fullerton") with securing the second purchase order from Sprint. Fullerton was Vigilante's CEO and President, and its only U.S.-based officer and Board member.

Throughout 2002 and during the first half of 2003, Vigilante's executives were in the process of lining up a new round of investment in Vigilante. By June 2003, one interested investor indicated it would approve a $7 million round of investment in Vigilante on the condition that Vigilante achieved $1 million in worldwide revenue in each of the second and third quarters of 2003. As a result, it became vitally important to Vigilante's continued financial health for VSA to secure the second purchase order from Sprint by the end of the third quarter of 2003. However, Sprint's order had been postponed due to "some technical issues."

The delay in the receipt of the second Sprint purchase order, combined with the fact that Vigilante was running short of the funds it had obtained during its prior investment round, strained VSA's ability to meet its ongoing cash needs. All of the officers and many of the employees of Vigilante and VSA were aware of both the ongoing cash shortage and the vital importance of hitting the revenue target to obtain the next round of investment. Sprint's $300,000 order would have enabled Vigilante to meet the revenue target and obtain the next

round of investment.

During this period, while cash flow was of great importance to Vigilante's prospects, Fullerton created two new companies, CougarSecurity.com ("Cougar") and Nevada Digital Marketing and Services, Inc. ("Nevada"), for the purpose of misappropriating income from Vigilante. Toward this end, Fullerton enlisted the help of Jesper Jurcenoks ("Jurcenoks"), whom Fullerton hired as an employee of Vigilante. Fullerton and Jurcenoks are principals of Cougar and Nevada.

Fullerton and Jurcenoks set up deals between Vigilante and Nevada and Cougar under which Vigilante granted these entities large commissions for work Fullerton and Jurcenoks were already obligated to perform as officers and employees of Vigilante. For example, in March 2003, Fullerton and Jurcenoks secretly executed an agreement between Vigilante and Nevada by which Nevada received a 35% commission on any purchase order received from Sprint by the end of 2003 – despite the fact that Jurcenoks was already obligated to serve and support Sprint as part of his employment by Vigilante. In another case, Fullerton secretly executed two more agreements with Nevada purporting to grant Nevada a license to sell services to users worldwide through the use of the SecureTest and AppShaker source code. The agreements allowed Nevada to collect service revenues from end users, but did not require Nevada to provide any of this revenue to Vigilante – in essence providing Nevada a 100% commission.

While Fullerton was making deals to siphon cash from Vigilante's coffers, he consistently reassured the other members of Vigilante's Board that he would secure the Sprint purchase order in time to achieve the revenue target. That changed on September 7, 2003, when Fullerton

PAGE 4 - OPINION AND ORDER

informed the Board that Sprint was not likely to place any order at all during 2003, and in any event would not place any order larger than $200,000. With VSA in arrears to its creditors and apparently no way to reach the revenue target, "Vigilante's Board (including Fullerton) voted to file a petition for bankruptcy protection for [VSA]."[2]

However, contrary to his representations to the Board, Fullerton already knew that Sprint would soon be sending him an order for $375,000. That revenue, together with Vigilante's other expected revenue, would have allowed Vigilante to meet its revenue target and to cover Vigilante's existing cash needs. However, Fullerton did not inform Vigilante's Board about the second Sprint order until over a month later – and even then misrepresented the amount as only $200,000.

On September 23, 2003, shortly after VSA declared bankruptcy, Fullerton sent a $375,000 proposal and quotation on Vigilante letterhead to Sprint. The next day, Sprint formally approved a $375,000 purchase order directed to Vigilante. Fullerton sent a $375,000 invoice to Sprint that same day. Two days later, Sprint faxed its $375,000 purchase order to "Vigilante Attn: Eric Fullerton." Fullerton told no other member of Vigilante's Board about Sprint's $375,000 purchase order. Had Fullerton informed the Board, the Board could have taken action to prevent the liquidation of VSA, remove VSA from bankruptcy, and consummate the investment deal.

Fullerton falsely told Philippe Eyries, the Chairman of Vigilante's board of directors, that Fullerton had invoiced Sprint for only $200,000. Susanne Fullerton, Fullerton's wife and his

---

[2] Despite the defendants' repeated attacks on this proposition as a legal impossibility, Vigilante has not explained how it is possible for Vigilante, rather than VSA's board of directors, to have declared the bankruptcy of VSA.

PAGE 5 - OPINION AND ORDER

"Executive Assistant" at Vigilante, forged a $200,000 invoice and input the document into Vigilante's accounting system with the specific intent to defraud Vigilante's Board into believing the Sprint purchase order was for only $200,000 – which was not enough to meet the revenue target. Susanne Fullerton personally stole from Vigilante the remaining $175,000 and either converted it to the Fullertons' personal use or used it to finance defendants' takeover of Vigilante's business operations. The $200,000 that Susanne Fullerton did report to Vigilante's Board was never used for any legitimate purpose, such that Susanne Fullerton actually misappropriated the entire $375,000 and converted it to defendants' unauthorized and illegal purposes.

Meanwhile, certain of the defendants plotted to usurp VSA's assets through the French bankruptcy proceedings. On October 16, 2003, Jurcenoks asked Reda Zitouni, a VSA employee, to help him "fabricate" a "cover story" defendants would use to mask their plan to use a "front" to place a bid on the SecureScan intellectual property rights ("IPR") in the French bankruptcy court. Jurcenoks indicated that the "[e]ndgame is to have . . . no ties to VIGILANTe [and] all VIGILANTe customers in US, UK and Scandinavia." Ultimately Fullerton and Jurcenoks settled on defendant Nexantis Corp. ("Nexantis"), which had been Vigilante's distributor in Asia for several years, to serve as the front. On or about November 1, 2003, Fullerton sent a message to Zitouni disclosing Nexantis' role in the scheme:

> [W]ell, Nex[antis] has approved their bid at the board level and
> will be visiting Paris next week . . . . [S]o I guess one third of our
> plan is about to be in place. . . . [The] second 1/3 is implementing
> so we actually get customer base in US and last 1/3 is getting you
> and your team to join [Jurcenoks] and me . . . .

PAGE 6 - OPINION AND ORDER

On November 21, 2003, Nexantis purchased the IPR for SecureScan Perimeter, SecureScan NX and SecureScan SP from the French bankruptcy court for 40,000 Euros, or approximately U.S. $48,000. Nexantis did not purchase any of Vigilante's assets, including: the source code for the SecureTest, AppShaker, and Vigi WDI software; the goodwill in the SecureScan, SecureTest and VIGILANTe names and associated trademark rights; and Vigilante's rights under its existing licensing agreements with its customers. These remained Vigilante's property. Nexantis also did not purchase VSA's "customer relationships," which, under French law, constitute separate property from VSA's contractual rights vis-a-vis its customers.

On November 21, 2003, without the knowledge or approval of Vigilante's Board, Fullerton sent a fax to defendant Gilbert Pion, President of Nexantis, purporting to grant Nexantis, on Vigilante's behalf, a royalty-free, worldwide license to "the trademark SecureScan . . . for a period of three months." That same day, Fullerton sent another fax to Pion arranging to meet him in Tokyo to discuss the scheme to take over Vigilante's research and development, distribution, service and support activities for all of Vigilante's customers. The day Fullerton left Japan, Pion emailed Fullerton a "Memorandum of Understanding" containing the following provisions, among others:

- Fullerton's netVigilance[3] would "organize a development team of seven engineers first based in France (i.e., certain VSA engineers, including defendants Cochin and Sudre) who would be moved to the U.S. in order to continue the development, maintenance and technical support of the SecureScan products;"

- Nexantis would pay netVigilance a $600,000 annual "management fee;"

---

[3] NetVigilance, Inc. is the assumed business name for defendant ArgusTest.com, Inc., a corporation of which Fullerton and Jurcenoks are principals.

- netVigilance would have the "distribution rights" for the SecureScan software in the U.S. and Europe; and

- Nexantis would pay netVigilance a "marketing fee" equal to 10% of net sales in 2004 and 5% of net sales in 2005.

-

The Memorandum also falsely stated that "Vigilante.com, Inc. is insolvent and expected to file for bankruptcy by December 1, 2003."

Also during this period from late September through December of 2003, defendants conspired to steal Vigilante's software and its relationships with customers and distributors. The plan involved seizing control of Vigilante's means of communication, such as its phone lines, fax lines, mail, email, and website, in order to redirect incoming business opportunities to netVigilance. Defendants also told customers and distributors that Vigilante was going out of business, and had selected Cougar and Nexantis to take over that business.

On September 24, 2003, Jurcenoks arranged for all faxes coming into Vigilante to be forwarded automatically to Cougar's fax number. Jurcenoks asked for Fullerton's "VIGILANTe creditcard" to pay for the new fax number. Defendants also began intercepting mail directed to Vigilante through U.S. mail and private carriers.

On October 29, 2003, Fullerton disclosed to Zitouni the "cover story" defendants would use to steal Vigilante and VSA's business while looking legitimate in the eyes of consumers and the press. The plan was for Fullerton to get VSA's "upgrade packages"[4] from Zitouni, after which point Fullerton would "introduce the new email practice where CougarSecurity is the

---

[4] "Upgrade packages," periodic software updates, are an important part of Vigilante's customer service because of the need to respond to newly-emerging computer viruses and other security challenges.

PAGE 8 - OPINION AND ORDER

company offering this to our customers. This will be [w]rapped in a story about VIGILANTe.com, Inc. outsourcing support, service and [software] maintenance to CougarSecurity, Inc." In a separate email, Fullerton told Zitouni that defendants "should move as many [of Vigilante's] perimeter customers to CougarScan as possible over the next two weeks," but that it was important that Eyries not be aware of this activity.

On November 2, 2003, Fullerton wrote another VSA engineer, Simon Assens, revealing that Fullerton had secretly changed the password on the VIGILANTe.com website. That same day, Fullerton altered the "vigilante.com" website so that customers attempting to email him at that website were referred to his email address at netVigilance.

Also on November 2, 2003, Jurcenoks notified Fullerton that the netVigilance.com/.net/.org internet domain names were registered to Vigilante in 2002. Nevertheless, defendants operated and continue to operate websites under these domain names.

On November 7, 2003, Jurcenoks asked defendant Cedric Cochin, a VSA engineer, to steal the AppShaker source code from VSA's computer in France. Jurcenoks expressly stated that he knew that the intellectual property rights for AppShaker were held by Vigilante. In addition to stealing the AppShaker source code from VSA's computer, Cochin stole thousands of dollars worth of hardware belonging to Vigilante, including several servers and computers.

On November 13, 2003, Lillian Jurcenoks sent an email to all SecureScan customers falsely asserting that Cougar had been "chosen by Vigilante" to replace Vigilante itself as the authorized provider of the SecureScan line of products and services.

On November 21, 2003, the same day Nexantis purchased the SecureScan IPR, Fullerton told Vigilante's European distributor that "[w]e have successfully moved all U.S. based

PAGE 9 - OPINION AND ORDER

SecureScan Perimeter customers to CougarScan Online. The SecureScan Perimeter platform will only run until November 30 when the VIGILANTe.com URL will be redirected and the Perimeter service as you know it will disappear."

The next day, Jurcenoks wrote Cochin that "VIGILANTe inc. has outsourced Perimeter operation of US customers to Cougar," that "Nex[antis] knows this" and that "Nex[antis] is currently considering if Cougar should also manage rest of World on Perimeter until Nex[antis] has its own [Asia Pacific] based Perimeter."

On November 27, 2003, defendant Patrick Besnard, Nexantis' Vice-President, e-mailed Jurcenoks (with a copy to Fullerton and Pion) regarding the defendants' plan to misappropriate Vigilante's goodwill in the SecureScan products. The document outlined a "plan for taking over SecureScan and transforming it into SecureScout." Besnard told Fullerton and Jurcenoks that one of their highest priorities would be to "preserve existing customer base and enable business expansion." However, the SecureScan customer base belonged to Vigilante, and accordingly was not defendants' to preserve.

Also on November 27, 2003, Fullerton received at his "vigilante.com" email address a request for proposal from a large potential customer. Fullerton forwarded the email to his "netVigilance.com" email address and then forwarded it again to Pion to enable defendants to usurp Vigilante's business opportunity by submitting their own proposal.

On November 27 and 29, 2003, defendants Pion, Besnard and Fullerton contacted four of Vigilante's distributors for the purpose of taking over Vigilante's relationships with those distributors.

On November 28, 2003, Vigilante Board member Dennis Bitan, still unaware of the plot,

spoke with Pion about the possibility of continuing the business relationship between Vigilante and Nexantis. Pion falsely told Bitan that he had not had time to think about his company's relationship with Vigilante and that he was not interested in any agreement concerning Vigilante's business operations.

On November 30, 2003, Fullerton tendered his resignation by email to Vigilante's Board. Although his employment contract required him to give 60 days' written notice of his resignation, Fullerton purported to resign effective immediately. That same day, Fullerton emailed a Cougar employee: "We need to find out how we transfer US based partners and customers with out being caught in breaking the law."

On December 1, 2003, Fullerton arranged for the misappropriation of Vigilante's customer support telephone line, instructing an engineer to "keep the support line, but change the [voice mail] message to netVigilance." That same day, Pion asked Fullerton to provide a database containing the contact information for Vigilante's customers and information about how to "check the existing rights those customers have" under their licensing agreements with Vigilante. Fullerton responded by asking Jurcenoks, Cochin and Sudre to steal the Vigi WDI source code and make it available to Fullerton and Pion.

On December 2, 2003, Jurcenoks directed Sudre to modify Vigilante's website so that any emails directed to Fullerton, Jurcenoks, Sudre, Cochin or Zopf (another VSA engineer) would automatically be forwarded to those individuals at netVigilance's website. Jurcenoks also instructed Sudre to forward to netVigilance all emails addressed to "support@vigilante.com," "info@vigilante.com," and "securenews@vigilante.com."

On December 5, 2003, Fullerton sent an email to all of Vigilante's customers, in which

he:

1. asserted that "Vigilante has no employees left and thus has no possibility of servicing any customers;"

2. stated that Nexantis and netVigilance had reached an agreement to jointly provide support, maintenance, and product development on the SecureScan line of products and services effective December 1, 2003;

3. stated that netVigilance would sell SecureScan products and services "in the Americas and in parts of Europe;" and

4. offered to "warrant any licenses you have already bought and paid for to VIGILANTe."

That same day, defendants sent emails to all of Vigilante's customers attaching a "SecureNews" newsletter that solicited the customers' IT security business and falsely stated that "[t]he company known as VIGILANTe is no longer in this business." Also on December 5, 2003, Fullerton informed Pion that defendants had closed a $600,000 licensing deal with Sprint in the third quarter of 2003. Defendants failed to disclose this $600,000 deal to Vigilante and instead usurped the opportunity for themselves.

On December 6, 2003, Fullerton directed Sudre to provide Nexantis the Vigi WDI source code without the knowledge or consent of Vigilante's Board and without any compensation to Vigilante. Nexantis accepted the Vigi WDI source code from Sudre with the knowledge that it was stolen, and has used the software to more effectively take over Vigilante's customer relationships and license agreements.

## III.    Fraud

### A.    Elements

Federal Rule of Civil Procedure 9(b) requires a claim of fraud to be pled with particularity. Under Oregon law, the elements of a fraud claim are:

PAGE 12 - OPINION AND ORDER

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's
> knowledge of its falsity or ignorance of its truth; (5) his intent that it
> should be acted on by the person and in the manner reasonably
> contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on
> its truth; (8) his right to rely thereon; and (9) his consequent and
> proximate injury.[5]

While a mere omission is not actionable in the absence of a duty to speak, no such duty is

required where a plaintiff alleges a defendant actively concealed a material fact. *Paul v. Kelley*,

42 Ore. App. 61, 65 (1979). "Any words or acts which create a false impression covering up the

truth, . . . or which remove an opportunity that might otherwise have led to the discovery of a

material fact . . . are classed as misrepresentations, no less than a verbal assurance that the fact is

not true." *Id*. at 66 (quoting PROSSER, LAW OF TORTS § 106, at 695 (4th ed 1971)).

**B.      Nexantis**[6]

The fraudulent actions Vigilante claims Nexantis committed include:

- concealing a plot to take over plaintiff's products, services, customers, distributors and business operations while purporting to remain plaintiff's loyal business partners;

- concealing from plaintiff the defendants' successful efforts to steal the source code for SecureTest, AppShaker and Vigi WDI; and

- concealing from plaintiff the fraudulent, royalty-free November 21, 2003 license to the SecureScan trademarks that Fullerton purported to grant Nexantis on plaintiff's behalf.

Vigilante argues that as a foreseeable result of its justifiable reliance on Nexantis' non-

disclosures, Vigilante suffered injury when it: (1) declared the bankruptcy of VSA; (2) lost many

---

[5] *Rice v. McAllister*, 268 Ore. 125, 128 (1974).

[6] Except where otherwise noted, "Nexantis" refers to defendants Nexantis Corp., Pion and Besnard collectively.

PAGE 13 - OPINION AND ORDER

of VSA's assets, including the SecureScan IPR that Nexantis purchased for below its market value; and (3) lost control of its products, services, customers, distributors, worldwide business operations and future business opportunities, all of which were taken over by the defendants. Nexantis moves to dismiss the fraud claim against it on the grounds that Vigilante does not have standing to assert claims based on injuries actually suffered by VSA, and the remaining defendants join in Nexantis' motion.

To have standing under Article III of the U.S. Constitution, a plaintiff must allege: (1) "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant;" (2) "that the injury fairly can be traced to the challenged action;" and (3) that the injury "is likely to be redressed by a favorable decision." *Franchise Tax Bd. of California v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990). In *Franchise Tax Board*, the Supreme Court held that a parent corporation had standing under Article III of the U.S. Constitution to assert claims based on the diminution of the value of its stock in its subsidiary. In that case, a parent corporation brought suit challenging the method by which the State of California taxed its subsidiary. The Court determined that the reduction in the value of the parent company's stock in the subsidiary from an improper method of taxation was sufficient "injury in fact" to the parent to confer it standing.

However, the Court also noted that in addition to Article III standing, there are prudential considerations related to standing. Among those considerations, the Court explicitly recognized and left intact the Ninth Circuit's "shareholder standing rule." That rule provides that "[g]enerally, a shareholder must assert more than personal economic injury resulting from a wrong to the corporation. A shareholder must be injured directly and independently of the

corporation." *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983) (internal citations omitted). The Ninth Circuit has stated that this rule "avoids multitudinous litigation and recognizes the corporate entity." *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838 (9th Cir. 1976).

Nexantis argues Vigilante fails to allege direct injuries to it that are independent from the alleged injuries to VSA. Rather, Vigilante's claims are simply that Nexantis caused injury to VSA, which reduced the value of VSA to Vigilante. In at least one respect, Nexantis' argument is clearly incorrect. Vigilante alleges that Nexantis participated in a successful plot to steal SecureTest, AppShaker and Vigi WDI directly from Vigilante. The complaint clearly alleges that these are assets of Vigilante, not VSA. Accordingly, there is no question that Vigilante has standing to assert this claim. Nexantis' motion to dismiss the claim in its entirety on the grounds of standing is therefore denied.

The question remains, however, whether Vigilante's claims are viable to the extent they assert injuries related to VSA's bankruptcy and loss of assets. Vigilante responds that the shareholder standing rule has no application to the instant case because the Complaint alleges a fraudulent conspiracy that specifically targeted Vigilante, rather than its French subsidiary. But the fact that the conduct may have been aimed at Vigilante is insufficient to confer it standing in the absence of a direct *injury* to Vigilante independent from the diminution of the value of its stock in VSA. *Shell*, 709 F.2d at 595.[7]

---

[7] Moreover, Vigilante's claim that the alleged fraudulent conduct was directed toward it, rather than toward VSA, is problematic at best. Vigilante alleges that the aim of defendants' conspiracy was to induce Vigilante to declare the bankruptcy of VSA. Vigilante does not explain, however, how a corporation's parent – i.e., its shareholder – can declare that corporation's bankruptcy. That power resides solely with a corporation's board of directors. *See,*

Vigilante further argues its injury was not simply the diminution of the value of its stock in VSA, but the total loss of VSA by virtue of that company's bankruptcy and liquidation. As a result, Vigilante lost an asset – namely, VSA itself – that was critical to the operation of Vigilante's own business. Vigilante analogizes its situation to that of the plaintiff in *Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995). Following the intestate death of reggae star Bob Marley, Marley's wife, attorney and accountant engaged in fraudulent schemes by which they diverted assets and income from Marley's estate. One of these schemes involved three recording and publishing companies (the "BVI Companies"), wholly-owned by Marley, that should have become estate property following Marley's death. However, the defendants forged documents creating the appearance that Marley had transferred those companies to his wife prior to his death. The trustee of Marley's estate brought suit, and defendants challenged the trustee's standing as a mere shareholder of the BVI Companies. The Second Circuit determined the trustee had standing because its claim was not that defendants had stolen assets from the BVI Companies, but that they had stolen the BVI Companies themselves from the estate: "where the individual owns property – cash, real estate, or shares of stock – and that property is stolen, the individual suffers an injury personal to him and no other." The Court therefore determined the trustee had standing to assert its claim.

*Bingham* is factually distinguishable from the instant case. In *Bingham*, the defendants used forged documents to steal an entire subsidiary, such that there was no apparent injury to the subsidiary itself. In essence, the subsidiary was stolen from the estate much like a thief might

*e.g.*, Or. Rev. Stat. 60.301(2) ("All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, the board of directors").

PAGE 16 - OPINION AND ORDER

have stolen jewelry or paintings. Moreover, even if the BVI companies had suffered an injury, they could not have brought a claim seeking redress of that injury because they were in the control of the defendants. The *Bingham* court emphasized that in this situation *only* the shareholder could properly seek redress for the injury. *Bingham,* 66 F.3d at 562 (where a shareholder complains that its shares were stolen, "the individual suffers an injury personal to him and no other. In such a case, it is only the individual that may properly seek to redress this injury."). In this situation, the prudential concerns of the shareholder standing rule are substantially mitigated. Recognizing standing does not disregard the corporate form because the parent corporation is asserting rights that are exclusively its own.

In contrast, in the instant case VSA unquestionably suffered its own injury from being driven into bankruptcy and thereby losing its assets.[8] While Vigilante may have been badly injured by VSA's bankruptcy, that injury is purely economic and flows only from the injury to the subsidiary. *Shell*, 709 F.2d at 595. In this circumstance, the court would have to disregard VSA's independent corporate existence to allow Vigilante to bring this suit.

Vigilante also argues it is in the position of the plaintiff in *Gomez v. Alexian Bros. Hospital of San Jose*, 698 F.2d 1019, 1021 (9th Cir. 1983). Gomez, a Hispanic doctor, practiced medicine under a professional corporation. The corporation submitted to defendant hospital a contract proposal for the operation of the hospital's emergency room. After the hospital rejected the proposal, Gomez filed suit alleging that the rejection was based on discriminatory reasons based on Gomez's Hispanic ancestry. Defendants argued Gomez lacked standing to bring this

---

[8] Moreover, Vigilante has identified no reason why VSA or its bankruptcy trustee could not bring this claim, despite a direct request from the court for additional briefing on this issue.

claim because it was the corporation, not Gomez, whose proposal had been rejected.  The Ninth

Circuit determined, however, that Gomez had standing by virtue of his allegation that the

defendants' failure to award the corporation a contract "deprived [Gomez] of employment as

director of defendants' emergency room and caused him 'humiliation and embarrassment.'"  *Id.*

The court determined these injuries were "personal to plaintiff and distinct from any injuries

suffered by [the corporation] as a result of defendants' conduct."  *Id.*  Accordingly, the

shareholder standing rule did not deprive Gomez of standing.

Vigilante does not allege the kind of direct, non-economic and personal injury suffered

by Dr. Gomez.  Gomez brought a Title VII claim alleging that he had been the victim of

discrimination on the basis of his ethnic heritage – a direct and personal injury which a

corporation cannot suffer.  Thus, *Gomez* merely affirms the general rule that a shareholder has

standing to sue where a defendant's conduct results in both an economic harm to the corporation

and causes a direct, independent and personal injury to the shareholder.  Thus, in *RK Ventures,*

*Inc. v. City of Seattle*, 307 F.3d 1045 (9th Cir. 2002), the individual owners of an incorporated

nightclub had standing to assert their individual claims for intentional infliction of emotional

distress, defamation, and violation of their rights under the First and Fourteenth Amendments.

Likewise in *Soranno's Gasco v. Morgan*, 874 F.2d 1310 (9th Cir. 1989), the sole shareholders of

a petroleum company had standing to assert claims for mental and emotional distress and

violations of their First Amendment rights.  In both cases the plaintiffs asserted personal claims

independent from mere "personal economic injury resulting from a wrong to the corporation."

*Id*. at 1318.

Although Vigilante has alleged that VSA's bankruptcy resulted in profound injury to

Vigilante itself, the relevant standing issue is not the magnitude of Vigilante's injury but whether it is a "personal economic injury resulting from a wrong to [VSA]." *Shell Petroleum*, 709 F.2d at 595. Vigilante's injuries fall squarely within that definition.[9] Accordingly, Vigilante's claims for fraud are dismissed to the extent they assert injuries based upon VSA's bankruptcy and loss of assets.

### C.    Jesper Jurcenoks

Defendant Jurcenoks argues the complaint fails to allege any representation made by Jurcenoks to Vigilante, and fails to allege any basis for a duty of disclosure to support a claim for misleading omissions. Alternatively, Jurcenoks moves under Fed. R. Civ. P. 9(b) to compel Vigilante to identify specific disclosures and the alleged basis of his duty to disclose.

The complaint alleges Jurcenoks actively concealed the plot to drive Vigilante into bankruptcy by directing Reda Zitouni, a VSA employee, to "keep [her] mouth shut about our project." Jurcenoks told Zitouni that it was important to play along with Vigilante Chairman Philippe Eyries' effort to purchase certain VSA software in the bankruptcy proceedings in order to allow Vigilante to continue to supply that software to U.S. customers. Vigilante's complaint therefore clearly alleges that Jurcenoks actively concealed material facts with the intention that Vigilante would rely on these omissions. Under Oregon law, this is sufficient to state a claim for

---

[9] Despite the seriousness of the allegations against the defendants in this action, Vigilante also has not shown that equitable considerations support disregarding the shareholder standing rule. As noted above, in response to this court's specific inquiry, Vigilante failed to identify any reason why VSA was unable to bring an action for its own injuries. Moreover, there can be little doubt that if Vigilante had been sued over the actions of VSA, Vigilante would have invoked the corporate separateness of its subsidiary as a shield against liability. It would be inequitable to allow Vigilante to cast aside the corporate fiction when it suits Vigilante's litigation purposes.

fraud. *Paul*, 42 Ore. App. at 65. In addition, these allegations are sufficiently particular to satisfy the requirements of Fed. R. Civ. P. 9(b). Accordingly, Jurcenoks' motion to dismiss the fraud claim against him is denied.

### D.    Lillian Jurcenoks

The complaint does not identify any alleged misrepresentation or omission by Lillian Jurcenoks, nor does it allege any basis for a duty to disclose on the part of this defendant. Indeed, the complaint does not allege any relationship whatsoever between Lillian Jurcenoks and Vigilante. Vigilante's fraud claim against Lillian Jurcenoks is therefore dismissed without prejudice.

### E.    Sudre

The complaint does not identify any alleged misrepresentation or omission by defendant Sudre. Vigilante's fraud claim against Sudre is therefore dismissed without prejudice.

### F.    ArgusTest defendants

The complaint does not identify misrepresentations or active concealment on behalf of the companies comprising ArgusTest.com, Inc. (netVigilance, Cougar, and Nevada[10]). While the complaint contains numerous allegations regarding misrepresentations or omissions by defendants Fullerton and Jurcenoks, who are principals of these entities, Vigilante has not alleged a basis for attributing the actions of these individuals to the corporate defendants. When dealing with corporations and shareholders under Oregon law, "[l]imited liability is the rule." *Amfac Foods, Inc. v. Int'l Systems & Controls Corp.*, 294 Ore. 94, 102, 654 P.2d 1092, 1098 (1982). Vigilante's fraud claim against these defendants is therefore dismissed without

---

[10] Collectively referred to hereinafter as "the ArgusTest defendants."

PAGE 20 - OPINION AND ORDER

prejudice.

## IV.   RICO

Vigilante asserts four RICO claims (claims seventeen through twenty) against each of the defendants.  As set forth above, to the extent these claims are based on alleged injuries to VSA, Vigilante lacks prudential standing to assert these claims.  Defendants Jurcenoks, Lillian Jurcenoks, ArgusTest.com, Inc., Cougar, Nevada, and Sudre (the "Jurcenoks defendants") further move to dismiss Vigilante's RICO claims to the extent they allege Vigilante as the relevant RICO "enterprise."

### A.   § 1962(b)

Vigilante's Seventeenth Claim asserts violations of 17 U.S.C. § 1962(b), which provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  The claim identifies Vigilante as one such "enterprise," and identifies Cougar, netVigilance, Nevada and Nexantis as another.  The Jurcenoks defendants move to dismiss this claim to the extent it rests on these defendants' alleged involvement in the "Vigilante Enterprise."  The Jurcenoks defendants argue the complaint makes no allegation that any of these defendants ever had "any interest in or control of" Vigilante.  Vigilante does not respond to the Jurcenoks defendants' argument regarding the Seventeenth Claim.  Absent amendment to the complaint, Vigilante cannot state a claim against the Jurcenoks defendants under 17 U.S.C. § 1962(b) on the basis of these defendants' alleged involvement in the "Vigilante Enterprise."

PAGE 21 - OPINION AND ORDER

**B.     § 1962(c)**

The Eighteenth Claim asserts violations of 17 U.S.C. § 1962(c), which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The Jurcenoks defendants move to dismiss this claim to the extent it rests on these defendants' alleged involvement in the "Vigilante Enterprise." The Jurcenoks defendants argue the complaint makes no allegation that any of these defendants "conduct[ed] or participate[d]" in the Vigilante Enterprise through a pattern of racketeering activity. With the exception of Jurcenoks and Sudre, defendants are correct. The complaint makes no allegation that either ArgusTest or Lillian Jurcenoks had any relationship with Vigilante whatsoever. While the complaint alleges Nevada and Cougar entered into contracts with Vigilante, and that Nevada received payments from Vigilante, it makes no allegation that these defendants conducted or participated in the Vigilante Enterprise. Vigilante's Eighteenth Claim with respect to defendants ArgusTest, Lillian Jurcenoks, Nevada and Cougar is therefore dismissed without prejudice.

Defendants Jurcenoks and Sudre argue the complaint merely alleges that they were "security engineers" for Vigilante; it does not allege that they were in a position to "conduct" Vigilante's affairs. This overstates the amount of participation required by a defendant in an enterprise. RICO requires only that a defendant undertake racketeering activities "*in connection with* the conduct of an enterprise." *Sun Savings and Loan Assoc. v. Dierdorff*, 825 F.2d 187, 195 (9th Cir. 1987) (emphasis in original). This requirement merely entails "a relationship between the enterprise and the racketeering activity." *Id*. Thus the required nexus exists "when (1) one is

PAGE 22 - OPINION AND ORDER

enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise." *Id.* In the case of Jurcenoks and Sudre, Vigilante alleges these defendants used their positions as employees of that company to perpetrate racketeering acts. Accordingly, defendants' motion to dismiss the Eighteenth Claim against defendants Jurcenoks and Sudre is denied.[11]

### C. Conspiracy and Aiding and Abetting

Claim Nineteen asserts violations of 17 U.S.C. § 1962(d), which prohibits conspiring to violate subsection (a), (b) or (c) of § 1962. The Twentieth Claim alleges defendants aided and abetted violations of § 1962(b), (c) and (d). In light of the foregoing, absent amendment, neither of these claims can rest upon the violations alleged in Claim Seventeen against the Jurcenoks defendants. Neither may such claims rest upon the violations alleged in Claim Eighteen against defendants ArgusTest, Lillian Jurcenoks, Nevada and Cougar, absent an amendment of that claim. However, the Jurcenoks defendants' motion to dismiss Claims Nineteen and Twenty is denied to the extent these claims rest upon the violations alleged in Claim Eighteen by Jurcenoks and Sudre.

## V. Common Law Unfair Competition

Vigilante asserts a claim for unfair competition under Oregon common law. The claim alleges:

---

[11] In their Reply brief, the Jurcenoks defendants argue that "most, if not all of the alleged predicate acts are insufficient on their face . . . because they are not 'racketeering acts,' and are not 'otherwise wrongful.'" However, the Jurcenoks defendants did not raise this challenge in their memorandum in support of their motion, thus depriving Vigilante of an opportunity to respond. The court therefore disregards this argument.

> Defendants have used, disclosed and commercially exploited the
> VIGILANTe Confidential Information [i.e., AppShaker,
> SecureTest, and Vigi WDI] . . . by entering into competition with
> Plaintiff, improperly soliciting Plaintiff's customers to switch their
> business to Defendants, improperly soliciting Plaintiff's
> distributors to become Defendants' distributors and improperly
> soliciting Plaintiff's employees to work for Defendants.

Nexantis argues this claim is superceded by the Oregon Uniform Trade Secrets Act, Or. Rev. Stat. § 646.461 *et. seq.* ("OUTSA"). "To establish a claim under [OUTSA], a plaintiff must demonstrate that: (1) the subject of the claim qualifies as a statutory trade secret; (2) the plaintiff employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of the defendants constitutes statutory misappropriation." *AcryMed, Inc. v. ConvaTec*, 317 F. Supp. 2d 1204, 1217 (D. Or. 2004) (internal quotation omitted). OUTSA "supersedes conflicting tort, restitution or other law of Oregon providing civil remedies for misappropriation of a trade secret." Or. Rev. Stat. § 646.473(1).

Vigilante argues its unfair competition claim does not conflict with OUTSA because Vigilante has pled extra elements not required for an OUTSA action. However, an examination of each of the elements Vigilante claims as "extra" reveals these elements fall squarely within OUTSA. For example, Vigilante points to its allegation that defendants had a confidential relationship with Vigilante. This allegation corresponds precisely to the statute's prohibition of acquiring trade secrets by "improper means," which the Act defines as "a breach of a duty to maintain secrecy." Or. Rev. Stat. § 646.461(1). Vigilante likewise argues it has pled the "extra" element that defendants "knew or should have known" of their duty to maintain the confidentiality of the information. This corresponds to the statute's prohibition against acquiring trade secrets "by a person who knows or has reason to know that the trade secret was acquired by

improper means."  Or. Rev. Stat. § 646.461(2)(a).  Finally, Vigilante argues it has pled "extra"

elements related to defendants' use of Vigilante's trade secrets to steal its customers, distributors

and employees.  This allegation is clearly encompassed by OUTSA's broad prohibition of any

"improper acquisition, disclosure or use of a trade secret."  Or. Rev. Stat. § 646.461(2);

*AcryMed*, 317 F. Supp. 2d at 1217.  Because Vigilante's unfair competition claim falls squarely

within the ambit of OUTSA, and does not plead any extra elements that might bring the claim

outside that statute's reach, OUTSA supercedes Vigilante's unfair competition claim.[12]

Vigilante's claim of unfair competition is therefore dismissed in its entirety.[13]  Because "it

---

[12] Defendants also argue Vigilante's unfair competition claim is preempted by the Copyright Act of 1976, 17 USC § 101 *et seq.*  "Copyright preemption is both explicit and broad: 17 U.S.C. § 301(a) prohibits state-law protection for any right equivalent to those in the Copyright Act."  *G.S. Rasmussen & Assoc. v. Kalitta Flying Serv.*, 958 F.2d 896, 904 (9th Cir. 1992).  Thus, in order to avoid preemption, "the state claim must protect rights which are qualitatively different from the copyright rights.  The state claim must have an 'extra element' which changes the nature of the action."  *Del Madera Properties v. Rhodes and Gardner, Inc.*, 820 F.2d 973, 976 (9th Cir. 1987).  Vigilante has pled sufficient extra elements to save its unfair competition claim from Copyright Act preemption.  Specifically, Vigilante could state a claim under the Copyright Act merely by alleging that defendants infringed its rights, as the software's copyright holder, "to reproduce the copyrighted work in copies," "to prepare derivative works based upon the copyrighted work," or "to distribute copies . . . to the public."  17 U.S.C. 106.  In the instant case, Vigilante claims not merely that defendants made unauthorized sales of Vigilante's copyrighted products, but that the defendants violated their obligation to keep information confidential and took advantage of its infringing use of the copyrighted material to steal customers, distributors and employees away from Vigilante.  Because these extra allegations render Vigilante's claim qualitatively different from a violation of the Copyright Act, that Act does not preempt Vigilante's unfair competition claim.

[13] The Jurcenoks defendants (Lillian Jurcenoks, Sudre, Nevada, netVigilance and Cougar) argue Vigilante did not allege a confidential relationship existed between these defendants and Vigilante.  Vigilante responds that these defendants "clearly acted as Fullerton's and Jurcenoks' agents and alter egos in carrying out their business activities generally and their misconduct toward Plaintiff specifically."  Simply arguing that this is "clear," however, is no substitute for showing where in the complaint this is alleged.  Because Vigilante has not alleged the existence of a confidential relationship between Vigilante and any of these defendants, Vigilante's unfair competition claim is properly dismissed as against these defendants for this reason as well.

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Knevelbaard*, 232 F.3d at 984, Vigilante's unfair competition claim is dismissed with prejudice.

## VI.     Tortious Interference with Economic Relations

Defendants move to dismiss Vigilante's claim for tortious interference with economic relations to the extent it rests on the claim that defendants stole Vigilante's customer database and programs, on the grounds that this claim is superceded by OUTSA.

Under Oregon law:

> [t]o state a claim for intentional interference with economic relations, a plaintiff must allege each of the following elements: (1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.[14]

Defendants do not argue Vigilante has failed to plead these elements, several of which are not elements of an OUTSA claim.  Simply put, OUTSA does not require the elements at the heart of a tortious interference claim – namely, intentional interference with a business relationship. While the alleged misappropriation of Vigilante's software and database overlaps with an OUTSA claim, this claim is not superceded by OUTSA as a "conflicting tort."  Or. Rev. Stat. § 646.473(1).  Accordingly, defendants' motions to dismiss this claim are denied.

## VII.     Conversion

Under Oregon law, "[c]onversion is an intentional exercise of dominion or control over a

---

[14] *McGanty v. Staudenraus*, 321 Ore. 532, 535, 901 P.2d 841, 844 (1995).

PAGE 26 - OPINION AND ORDER

chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."  *In re Complaint as to the Conduct of Martin*, 328 Ore. 177, 184, 970 P.2d 638, 642 (1998).  Defendants do not dispute that Vigilante can state a claim for conversion based on the alleged theft of hardware, cash, and other tangible property by certain of the defendants.  However, defendants argue Vigilante's conversion claim is preempted by the Copyright Act and/or OUTSA to the extent that claim is based on the alleged theft of the source code for Vigilante's software.

Vigilante responds that it has pled extra elements that save the conversion claim from preemption.  Vigilante argues its conversion claim contains the "extra" element that defendants "exercised dominion and control over Plaintiff's property."  Regarding the software source code defendants allegedly copied, it is not clear in what sense this is true.  Generally, a conversion claim applies to tangible property.  *Dielsi v. Falk*, 916 F.Supp. 985, 992 (C.D. Cal. 1996) (quoting NIMMER ON COPYRIGHT § 1.01 [B](1)(I) ("The torts of conversion and trespass relate to interference with tangible rather than intangible property.")).  Indeed, the Restatement (Second) of Torts[15] defines conversion as "an intentional exercise of dominion or control *over a chattel.*"  Black's Law Dictionary defines a "chattel" as "[m]oveable or transferable property; personal property; esp. a physical object capable of manual delivery."  Thus, had Vigilante claimed defendants had stolen the disks on which the source code was written, that could form the basis of the conversion claim.  However, under Oregon law Vigilante cannot state a claim for conversion of the source code itself.

---

[15] Oregon courts have "accepted the definition of conversion found in section 222A of the Restatement (Second) of Torts (1965)."  *Martin*, 328 Ore. at 184.

PAGE 27 - OPINION AND ORDER

In any event, Vigilante's allegation that defendants exercised dominion and control over Vigilante's software by downloading the source code does not qualify as an extra element to avoid Copyright or OUTSA preemption. Defendants allegedly exercised "dominion and control" only by copying the source code and reproducing it. This activity violates the Copyright Act's prohibition of unauthorized reproduction of copyrighted material and OUTSA's prohibition of unauthorized use of trade secrets. *See, e.g., Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1130 (N.D. Cal. 2001) ("where a plaintiff is only seeking damages from a defendant's reproduction of a work – and not the actual return of a physical piece of property – the claim is preempted" by the Copyright Act); *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003) ("A conversion claim arising from the unauthorized reproduction and distribution of a copyrighted work only interferes with the plaintiff's intangible property right and is equivalent to a claim for copyright infringement.").

Vigilante also claims it has pled the "extra" element that defendants acted "intentionally and wrongfully." However, the addition of an element of intent is insufficient to remove a conversion claim from the Copyright Act's broad preemption. *See, e.g., Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003) ("conversion claims generally are preempted even though there is an additional element of intent.").

Because Vigilante has asserted several grounds for its conversion claim, most of which are uncontested, this claim is not dismissed in its entirety. However, Vigilante cannot base its claim of conversion on the defendants' alleged copying of software code.

**VIII. Unjust Enrichment**

Vigilante's complaint alleges that "[b]y their actions and omissions recited above [in the

complaint], defendants have been, and continue to be, unjustly enriched to the detriment of Plaintiff."  Defendants argue that to the extent this claim is based on defendants' alleged unauthorized reproduction of copyrighted work and misappropriation of trade secrets, this claim is preempted by the Copyright Act and OUTSA.

Defendants are correct.  "[C]laims for unjust enrichment are [] generally preempted" by the Copyright Act.  *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003); *see also Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987).

> While a claim for unjust enrichment may require proof that a benefit was conferred on the defendant, where the unjust enrichment arises from defendants' unauthorized use of a copyrighted work, such an extra element does not qualitatively change the rights at issue, the rights the plaintiff holds in the copyrighted work, and does not avoid [Copyright] preemption.[16]

Vigilante's unjust enrichment claim is also superceded by OUTSA to the extent it is based on misappropriation of trade secrets.  *Acrymed*, 317 F. Supp. 2d. at 1218 (plaintiff's claim that defendants "derived substantial benefit" from use of plaintiff's trade secrets preempted by OUTSA); *Nike, Inc. v. Dixon*, 2004 U.S. Dist. LEXIS 17657, *13-15 (D. Or. 2004) (unjust enrichment claim preempted by OUTSA).

Thus, while Vigilante may be able to assert a claim for unjust enrichment on other grounds – and, accordingly, the claim is not dismissed – Vigilante may not state a claim for

---

[16] *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003); *see also Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1126 (N.D. Cal. 2001) ("where the plaintiff's theory of relief is that the defendant has improperly benefitted from using a certain work and that a contract should be implied in law (e.g., a quasi-contract, quantum meruit, or unjust enrichment claim), such claims are preempted" by the Copyright Act).

unjust enrichment based on allegations regarding defendants' unauthorized reproduction of copyrighted work and misappropriation of trade secrets.

## IX. Negligent Misrepresentation

Defendants move to dismiss Vigilante's negligent misrepresentation claim for failure to state a claim on several grounds. The elements of a negligent misrepresentation claim under Oregon law are: (1) a special relationship between plaintiff and defendants; (2) that defendants failed to exercise reasonable care by negligently making false representations or omitting material facts; (3) plaintiff's reasonable reliance on those false representations or omissions; and (4) damages sustained by plaintiff. *Prosser v. Safeco Insurance Co.*, 2001 U.S. Dist. Lexis 8341 (D. Or. June 15, 2001) (citing *Conway v. Pacific University*, 324 Or. 231, 241 (1996)).

Certain defendants argue Vigilante has failed to plead the existence of special relationships. The complaint alleges that "each Defendant, directly or through its agents, had a special relationship with Plaintiff, e.g., as Plaintiff's officer, employee, business partner and/or distributor, whereby the Defendant was purportedly acting to further the economic interests of Plaintiff." Nexantis argues the relationship alleged between Vigilante and Nexantis – that of a company to its distributor – cannot qualify as a special relationship as a matter of Oregon law. Oregon courts, however, have eschewed a bright line rule defining which types of relationships qualify as "special," instead requiring factfinders to examine all the facts surrounding a relationship. *Onita Pac. Corp. v. Trustees of Bronson*, 315 Ore. 149, 159, 843 P.2d 890, 896 (1992); *Conway*, 324 Or. at 241. In that regard, while a mere distributorship relationship is insufficient, in and of itself, to create a special relationship, neither does this relationship preclude a finding that a special relationship exists. Vigilante has pled sufficient facts to put

PAGE 30 - OPINION AND ORDER

Nexantis on notice of the alleged basis of a special relationship – namely, that in its role as a longstanding "business partner" and/or "distributor" of Vigilante, Nexantis purported to act to further Vigilante's economic interests, thus imposing a burden upon Nexantis to exercise due care in its representations to Vigilante. *Conley*, 355 U.S. at 48.

The same analysis applies to the Fullerton defendants. Vigilante has alleged that the facts surrounding Eric Fullerton's position as an officer of Vigilante, and Susanne Fullerton's position as a Vigilante employee, were such that these defendants purported to act to further Vigilante's economic interests, thus imposing a burden upon these defendants to exercise due care in their representations to Vigilante. The complaint is sufficient to put these defendants on notice of the alleged basis of a special relationship.

However, Vigilante's negligent misrepresentation claim fails adequately to allege the nature of its reliance upon the alleged misrepresentations and omissions of the defendants. The Oregon Supreme Court has cited approvingly to the definition of negligent misrepresentation found in § 552 Restatement (Second) of Torts (1977). *Onita*, 315 Ore. at 159. That section limits liability under the claim to losses suffered "through reliance upon [the misrepresentation] in a transaction that [the tortfeasor] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." Vigilante argues the complaint adequately pleads its reasonable reliance by alleging that Vigilante "lost all of its customers and distributors and was thereby injured in connection with third party transactions." While this adequately alleges an injury, it does not identify the nature of Vigilante's reliance upon any misrepresentations. In order to put the defendants on notice of the negligent misrepresentation claims against them, Vigilante's complaint must allege: (a) how Vigilante relied, (b) on what

PAGE 31 - OPINION AND ORDER

misrepresentations by which parties, (c) with respect to what business transactions.

In addition to the foregoing, the complaint does not allege any misrepresentations by defendants Lillian Jurcenoks or Sudre. While there are allegations of misrepresentations by Fullerton and Jurcenoks, who are principals of netVigilance, Cougar, and Nevada, the complaint does not identify any alleged misrepresentations made on behalf of these corporate entities.

For the aforementioned reasons, Vigilante's negligent misrepresentation claim is dismissed without prejudice.

## X.    Money Had and Received

"Oregon recognizes the action of assumpsit for money had and received. An essential element of the action is that the defendant wrongfully appropriated the plaintiff's property and was thereby unjustly enriched." *McCarthy v. Tomlinson*, 91 Ore. App. 685, 687, 756 P.2d 687, 688 (1988) (internal citations omitted).

Nexantis seeks dismissal of Vigilante's money had and received claim against it on the grounds that the complaint fails to state a claim. The complaint alleges "Defendants have misappropriated hundreds of thousands of dollars in Plaintiff's funds, including without limitation the $375,000 purchase order from Sprint, the unauthorized 'commissions' to Nevada Digital and Cougar and the fraudulent 'reimbursements' to Fullerton and Jurcenoks." None of the allegations in the 102-page complaint connects Nexantis to any of these activities.

In its opposition brief, Vigilante points to entirely new allegations as the bases for its claim of money had and received against Nexantis. For example, Vigilante notes its allegation that "Nexantis was aware of Defendants' misappropriation of the Sprint account." Yet Vigilante offers no authority for the proposition that mere knowledge of another's misappropriation is

sufficient to subject a defendant to liability on a claim for money had and received.

Vigilante also argues that the complaint alleges the Nexantis defendants were "instrumental in misappropriating Plaintiff's customers, distributors and 'Vigi WDI' customer management software."  These facts are not fairly pled as part of Vigilante's money had and received claim.  Not only do these allegations not match the specific allegations found in the claim, but they are not even of the same type of activities about which the claim complains. Moreover, even these allegations do not state that Nexantis wrongfully appropriated money, or anything "actually or presumptively converted into money."  *United States Nat'l Bank v. Miller*, 74 Or. App. 405, 410 (1985); *see also* BLACK'S LAW DICTIONARY 1027 (8th ed. 2004) (defining "money" as  "assets that can be easily converted into cash").  Accordingly, Vigilante's claim for money had and received against Nexantis is dismissed with leave to re-plead.

Vigilante's claim against defendants ArgusTest, Lillian Jurcenoks, and Sudre also fails. Vigilante argues the complaint alleges Lillian Jurcenoks executed several of the sweetheart deals used to pay fraudulent commissions to Cougar, and that Sudre hijacked plaintiff's website and was instrumental in misappropriating Vigilante's customer management software.  Vigilante argues "[t]hus, both Lillian Jurcenoks and Cougar were alleged to directly divert cash for Plaintiff."  However, the complaint does not allege that these defendants ever "received" any of Vigilante's money, or money owed to Vigilante by another.  In addition, Vigilante cites no authority for the proposition that Vigilante's website and customer management software qualify as "money" for the purposes of a money had and received claim.  This claim is therefore also dismissed as against defendants ArgusTest, Lillian Jurcenoks, and Sudre with leave to re-plead.

**XI.    Constructive Trust**

Nexantis moves to dismiss Vigilante's constructive trust "claim" on the grounds that constructive trust is merely a remedy rather than a separate claim for relief:

> [A] survey of Oregon decisions shows that at least three elements must be present before a court imposes a constructive trust: (1) the existence of a confidential fiduciary relationship; (2) a violation of a duty imposed by that relationship; and (3) failure to impose the constructive trust would result in unjust enrichment.

*Hollen v. Fitzwater*, 125 Or. App. 288, 292, 865 P.2d 1298, 1300 (1993).

Vigilante concedes that "courts in Oregon have characterized a constructive trust as a remedy rather than a cause of action," but argues that dismissing its claim "would be unduly harsh here, where Plaintiff has alleged all elements necessary to establish a constructive trust." However, it does not appear that dismissing this claim has any substantive effect on Vigilante. Vigilante has requested the imposition of a constructive trust in its prayer for relief, such that the court may impose a constructive trust if Vigilante succeeds in establishing its entitlement to relief at trial. This "claim" is therefore dismissed with prejudice.

## XII.    Copyright Infringement

Defendants Besnard and Pion move to dismiss Vigilante's claim for copyright infringement against them for failure to state a claim. These defendants can only be liable under § 501 of the Copyright Act if they personally violated one or more of the exclusive rights granted by § 106 at issue in this case – i.e., the rights to copy, to prepare derivative work, or to distribute. A corporate officer may be liable for direct infringement if the officer personally infringes the copyrighted work by personally engaging in any of these exclusive rights. 17 U.S.C. § 501; MELVILLE NIMMER & DAVID NIMMER, 3 NIMMER ON COPYRIGHT § 10.04[A][3][d], at 12-99 n.109.1 (2004). Alternatively, a corporate officer may be indirectly

liable for the corporation's direct copyright infringement by virtue of the officer's conduct and relation to the corporation. "An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement." *Southern Bell Tel. & Tel. Co. v. Assoc. Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985).

Vigilante argues the complaint states a claim for infringement by Pion and Besnard under either theory of liability. Vigilante argues Pion infringed Vigilante's copyrights in the AppShaker software by asserting in faxes and letters that Nexantis owns the software, thus "confirming that he personally is involved in Nexantis' use of the copyrighted software." However, in assessing defendants' motions to dismiss, the court is not looking for evidence from which a juror might conclude that Pion infringed, but rather for an allegation in the Complaint that Pion copied, distributed, or prepared derivative works of AppShaker, or that Pion oversaw such infringement. Because no such allegations appear in the complaint, Vigilante has not stated a claim of infringement against Pion on this basis.

Vigilante also argues it has stated a claim for infringement against Pion and Besnard based on the fact that these defendants made commercial use of plaintiff's SecureTest trademark. Vigilante argues that "[i]t can be inferred that . . . [Fullerton and Jurcenoks] provided the SecureTest software to Pion and Besnard" and that "Pion's and Besnard's use of the 'SecureTest' trademark was in connection with the associated software." Again, however, the question before the court on defendants' motions is not what could be inferred from the complaint, but what the complaint alleges. Because the complaint does not allege Pion or Besnard personally copied, distributed, or prepared derivative works of the SecureTest software, or that they oversaw any

such infringing acts, Vigilante has not stated a claim of direct infringement against Pion and Besnard on this basis.

Finally, Vigilante argues it can state a claim of infringement against Pion and Besnard based on their request for, and receipt of, plaintiff's Vigi WDI customer database software from Fullerton, Jurcenoks and Sudre. The complaint alleges that Besnard asked Fullerton and Jurcenoks to preserve Vigilante's existing customer base. Shortly thereafter, Pion asked Fullerton to provide a database containing the contact information for Vigilante's customers and asking for information about how to check the existing rights those customers had under their licensing agreements with Vigilante. Fullerton and Sudre misappropriated a copy of the software and provided it to Pion. Nexantis accepted the Vigi WDI source code from Sudre with the knowledge that it was stolen, and has used the software to more effectively take over Vigilante's customer relationships and license agreements. However, nowhere does the complaint allege that Pion or Besnard personally copied, distributed, or prepared derivative works of the Vigi WDI software. Accordingly, Vigilante cannot state a claim of direct infringement against Pion and Besnard.

Vigilante has, however, stated a claim for indirect infringement against these defendants based on Besnard's and Pion's involvement in the alleged misappropriation of Vigi WDI. The defendants asked for the software and received it, knowing that others perpetrated copyright infringement to obtain the software. Because these defendants instigated and directed the infringing activity, they can be held liable for the infringement. *Southern Bell*, 756 F.2d at 811. The defendants' motion to dismiss is therefore denied.

## XIII. Trademark Infringement

Nexantis moves to dismiss Vigilante's trademark infringement claim regarding the SecureTest mark for failure to state a claim. Vigilante has asserted claims under 15 U.S.C. § 1114(1)(a) for the alleged infringement of the "registered VIGILANTe and SecureScan marks and the unregistered SecureTest mark." Vigilante does not dispute the fact that, by its terms, 15 U.S.C. § 1114(1)(a) applies only to registered marks. While Vigilante's claims for trademark infringement of the VIGILANTe and SecureScan marks are viable, Vigilante cannot state a claim for trademark infringement based on an alleged infringement of the unregistered SecureTest mark. Accordingly, Vigilante's trademark infringement claim regarding the SecureTest mark is dismissed with prejudice.

## XIV.  Vigilante's Motion to Dismiss "Counterclaim" for Attorneys' Fees

Nexantis has asserted a "counterclaim" for attorneys' fees. Vigilante moves to dismiss this counterclaim for failure to state a claim, on the grounds that Fed. R. Civ. P. 54(d)(2)(A) requires demands for attorneys' fees to be made by motion. Nexantis does not dispute the impropriety of asserting a "claim" for attorneys' fees, but argues Vigilante waived its right to challenge the counterclaim by pleading a right to recover costs and attorneys fees in its complaint. This argument lacks merit. Vigilante did not assert a "claim" for attorneys' fees, but rather claims entitlement to attorneys' fees as damages resulting from its other, enumerated claims. Vigilante's motion to dismiss Nexantis' counterclaim is therefore granted.

## XV.  Conclusion

As set forth above, Defendants' motions to dismiss and motions for judgment on the pleadings (#44, 55, 57, 60 and 62) are granted in part and denied in part. Vigilante's fraud and RICO claims are dismissed with prejudice to the extent they assert injuries based upon VSA's

PAGE 37 - OPINION AND ORDER

bankruptcy and loss of assets. Vigilante's fraud claims are also dismissed without prejudice as to Lillian Jurcenoks, Sudre, and the ArgusTest defendants.

RICO Claim Seventeen is dismissed without prejudice as against the Jurcenoks defendants, and Claim Eighteen is dismissed without prejudice as against the ArgusTest defendants and Lillian Jurcenoks. Claims Nineteen and Twenty are dismissed without prejudice to the extent these claims rest upon the violations alleged in Claim Seventeen against the Jurcenoks defendants, and the violations alleged in Claim Eighteen against the ArgusTest defendants and Lillian Jurcenoks.

The conversion claim is dismissed with prejudice to the extent it is based on the alleged theft of the source code for Vigilante's software. Similarly, Vigilante may not state a claim for unjust enrichment based on allegations regarding defendants' unauthorized reproduction of copyrighted work or misappropriation of trade secrets.

Vigilante's claims for unfair competition, constructive trust, and infringement of the unregistered SecureTest mark are dismissed with prejudice. Vigilante's claims for negligent misrepresentation and money had and received are dismissed with leave to re-plead.

Vigilante's motion to dismiss (#72) is granted, and Nexantis' "counterclaim" for attorneys fees is dismissed.

IT IS SO ORDERED.

DATED this 6th day of    September    , 2005.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

PAGE 38 - OPINION AND ORDER